**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| REGINALD C. WALKER, | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. H-05-2308 |
| | § | |
| JO ANNE B. BARNHART, | § | |
| COMMISSIONER OF | § | |
| SOCIAL SECURITY, | § | |
| Defendant. | § | |

**MEMORANDUM AND ORDER ON
MOTIONS FOR SUMMARY JUDGMENT**

On August 2, 2006, the parties consented to proceed before a United States magistrate judge for all purposes, including the entry of a final judgment, under 28 U.S.C. § 636(c).  The case was then transferred to this court.  Cross-motions for summary judgment have been filed by Plaintiff Reginald C. Walker ("Plaintiff," "Walker") and Jo Anne B. Barnhart ("Defendant," "Commissioner"), in her capacity as Commissioner of the Social Security Administration ("SSA"). (Plaintiff's Motion for Summary Judgment ["Plaintiff's Motion"], Docket Entry #15; Commissioner's Motion for Summary Judgment ["Defendant's Motion"], Docket Entry #16).  Each party has responded to those cross-motions.  After considering the pleadings, the evidence submitted, and the applicable law, it is ORDERED that Plaintiff's Motion for Summary Judgment is GRANTED, and that Defendant's Motion for Summary Judgment is DENIED.  It is further ORDERED that Plaintiff's claim for benefits is REMANDED, so that the record can be developed further in accordance with this opinion.

**Background**

On February 26, 2003, Plaintiff Reginald Walker filed applications for both Social Security Disability Insurance Benefits ("DIB"), under Title II of the Social Security Act ("the Act"), and for

Supplemental Security Insurance ("SSI") benefits, under Title XVI of the Act.[1] (Plaintiff's Motion at 3; Tr. at 69).  He claimed that he had been unable to work since July 2, 2002, following a work-related injury the previous week, which resulted in severe back pain and depression.  (Tr. at 18, 84).  The SSA denied his application on April 3, 2003, after deciding that he is not disabled under the Act.  (Tr. at 24).  Plaintiff petitioned, unsuccessfully, for a reconsideration of that decision.  (Tr. at 25).

Plaintiff then requested a hearing before an administrative law judge ("ALJ").  (Tr. at 40).  That hearing took place on June 30, 2004, before ALJ William Howard.  (Tr. at 385).  Plaintiff appeared and testified at the hearing, and he was accompanied by his attorney, Donald Dewberry.  (*Id.*).  The ALJ also heard testimony from Dr. Wesley Scott ("Dr. Scott"), an orthopedic surgeon, and Kay Gilreath ("Ms. Gilreath"), a vocational expert witness.  (Tr. at 419, 449).

On July 26, 2004, the ALJ engaged in the following five-step, sequential analysis to determine whether Plaintiff was capable of performing substantial gainful activity or was, in fact, disabled:

1.  An individual who is working or engaging in substantial gainful activity will not be found disabled regardless of the medical findings.  20 C.F.R. §§ 404.1520(b) and 416.920(b).

2.  An individual who does not have a "severe impairment" will not be found to be disabled.  20 C.F.R. §§ 404.1520(c) and 416.920(c).

3.  An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will not be considered disabled without consideration of vocational factors.  20 C.F.R. §§ 404.1520(d) and 416.920(d).

4.  If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.  20 C.F.R. §§ 404.1520(e) and 416.920(e).

---

[1] While the rules governing DIB and SSI differ, an applicant seeking either benefit must first prove that he is "disabled" within the meaning of the Act.  *See* 42 U.S.C. §§ 423(d), 1382c(a)(3) and (a)(3)(G); 20 C.F.R. §§ 404.1505(a), 416.905(a); *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994).

> 5.   If an individual's impairment precludes performance of his past work, then other factors, including age, education, past work experience, and residual functional capacity must be considered to determine if any work can be performed.  20 C.F.R. §§ 404.1520(f) and 416.920(f).

*Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000); *Martinez v. Chater*, 64 F.3d 172, 173-74 (5th Cir. 1995); *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991); *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991); *Harrell v. Bowen*, 862 F.2d 471, 475 (5th Cir. 1988).  It is well-settled that, under this analysis, Walker has the burden to prove any disability that is relevant to the first four steps.  *See Wren*, 925 F.2d at 125.  If he is successful, the burden then shifts to the Commissioner, at step five, to show that he is able to perform other work that exists in the national economy.  *See Myers v. Apfel*, 238 F.3d 617, 619 (5th Cir. 2001); *Wren*, 925 F.2d at 125.  "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis."  *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

It must be emphasized that the mere presence of an impairment does not necessarily establish a disability.  *See Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992) (quoting *Milam v. Bowen*, 782 F.2d 1284, 1286 (5th Cir. 1986)).  An individual claiming disability insurance benefits under the Act has the burden to prove that he suffers from a disability.  *See Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988); *Cook v. Heckler*, 750 F.2d 391, 393 (5th Cir. 1985).  Under the Act, a claimant is deemed disabled only if he demonstrates an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than twelve months."  *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990) (citing 42 U.S.C. § 423(d)(1)(A)).  Substantial gainful activity is defined as "work activity involving significant physical or mental abilities for pay or profit."  *Newton*, 209 F.3d at 452.  A physical or

mental impairment is "an impairment that results from anatomical, physiological or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983) (citing 42 U.S.C. § 423(d)(3)). Further, the impairment must be so severe as to limit the claimant so that "[he] is not only unable to do [his] previous work but cannot, considering [his] age, education, and work experience, engage in any kind of substantial gainful work which exists in the national economy." *Greenspan*, 38 F.3d at 236 (citing 42 U.S.C. § 423(d)(2)(A)).

Based on these principles, as well as his review of the evidence presented at the hearing, the ALJ determined that Plaintiff has "[a] pain disorder, affective mood disorder, degenerative joint disease of the lumbar spine and lumbar and groin strain." (Tr. at 19). Although he determined that these impairments, alone and in combination, are severe, he concluded, ultimately, that they do not meet, or equal in severity, the medical criteria for any disabling impairment in the applicable SSA regulations. (Tr. at 22). The ALJ then assessed Walker's residual functional capacity ("RFC"), and found that his previous work, as a computer circuit board tester, was not precluded by his impairments. (Tr. at 23). He determined, therefore, that because Walker could return to his previous work, he is "not under a 'disability' as defined in the Social Security Act, at any time through the date of this decision." (*Id.*). He then denied Walker's application for benefits. (*Id.*).

On September 21, 2004, Plaintiff requested an Appeals Council review of the ALJ's decision. (Tr. at 12). SSA regulations provide that the Appeals Council will grant a request for a review if any of the following circumstances is present: "(1) there is an apparent abuse of discretion by the ALJ; (2) an error of law has been made; (3) the ALJ's action, findings, or conclusions are not supported by substantial evidence; or (4) there is a broad policy issue which may affect the public interest." 20 C.F.R. §§ 404.970 and 416.1470. On April 14, 2005, the Appeals Council denied

4

Plaintiff's request, concluding that no reason for review existed under the regulations.  (Tr. at 5).

With that ruling, the ALJ's findings became final.  *See* 20 C.F.R. §§ 404.984(b)(2) and

416.1484(b)(2).  On June 8, 2005, Plaintiff filed this lawsuit, pursuant to section 205(g) of the Act

(codified as amended at 42 U.S.C. § 405(g)), to challenge that decision.  (Plaintiff's Complaint

["Complaint"], Docket Entry # 1).  Subsequently, the parties filed cross-motions for summary

judgment.  Having considered the pleadings, the evidence submitted, and the applicable law, the

court concludes that Plaintiff's motion should be granted, and that Defendant's motion should be

denied.  Further, Plaintiff's claim for benefits is remanded to the Commissioner so that the record

can be developed further on the severity of both his physical and his mental impairments.

## Standard of Review

Federal courts review the Commissioner's denial of disability benefits only to ascertain

whether the final decision is supported by substantial evidence and whether the proper legal

standards were applied.  *See Newton*, 209 F.3d at 452 (citing *Brown v. Apfel*, 192 F.3d 492, 496 (5th

Cir. 1999)).  "If the Commissioner's findings are supported by substantial evidence, they must be

affirmed."  *Id.* (citing *Martinez*, 64 F.3d at 173).  "Substantial evidence is such relevant evidence

as a reasonable mind might accept to support a conclusion.  It is more than a mere scintilla and less

than a preponderance."  *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995); *see Martinez*, 64 F.3d

at 173 (quoting *Villa v. Sullivan*, 895 F.2d 1019, 1021-22 (5th Cir. 1990)).  On review, the court

does not "reweigh the evidence, but . . . only scrutinize[s] the record to determine whether it contains

substantial evidence to support the Commissioner's decision."  *Leggett v. Chater*, 67 F.3d 558, 564

(5th Cir. 1995); *see Fraga v. Bowen*, 810 F.2d 1296, 1302 (5th Cir. 1987).  In making this

determination, the court must weigh the following four factors:  the objective medical facts; the

diagnoses and opinions from treating physicians on subsidiary questions of fact; Plaintiff's own

testimony about his pain; and Plaintiff's educational background, work history, and present age.  *See Wren*, 925 F.2d at 126.  If no credible evidentiary choices or medical findings exist that support the Commissioner's decision, then a finding of no substantial evidence is proper.  *See Johnson*, 864 F.2d at 343.

**Discussion**

In his motion, Plaintiff claims that he became disabled on June 25, 2002, because of back pain and depression that resulted from an injury he received at work.  (Plaintiff's Motion at 3).  He asks this court to reverse the Commissioner's decision to deny him disability benefits, and to render a judgment in his favor, for numerous reasons.  First, Walker claims that the ALJ erred because he failed to make any findings of fact on the physical and mental demands of his previous employment. (*Id.* at 6).  Next, he alleges that the ALJ failed to compare his actual functional capacity with the physical and mental demands of that employment.  (*Id.* at 9).  He also contends that the ALJ did not base his assessment of his mental RFC on the opinion of any medical source.  (*Id.*).  In sum, he argues that "the ALJ's decision is not supported by substantial evidence and the proper legal standards were not applied," warranting an award of benefits or a remand of his case.  (*Id.* at 13). Defendant insists, however, that the ALJ properly considered all of the available evidence, and followed the applicable law in determining that Plaintiff is not disabled.  (Defendant's Response at 6-12).

### *Medical Facts, Opinions, and Diagnoses*

The earliest medical record shows that, on July 8, 2002, Walker was examined by Dr. Larry Likover ("Dr. Likover"), an orthodpedic surgeon.  (Tr. at 122).  He was referred to Dr. Likover by his employer, Northwest Pipe, following an injury he received while maneuvering heavy pipe.  (*Id.*). (Tr. at 122, 129).  Walker complained to Dr. Likover of lower back, leg, and groin pain which made

it difficult for him to walk.  (*Id.*).  Dr. Likover found that Walker had a "full range of lumbar[2] motion

with full lumbar flexion,[3] lateral bending, and extension present."  (Tr. at 122).  He diagnosed

Walker as suffering from lumbar and groin strain, and prescribed Naprosyn for his pain.  (Tr. at

123).  He also gave Walker permission to continue "light duty" work.  (*Id.*).  At a follow-up

examination, on July 17, 2002, Dr. Likover reported, "I advised Mr. Walker that he may continue

working light duty, which he is not happy about at this time," and that Plaintiff "feels he cannot

work with back pain and groin pain."  (Tr. at 121).  On July 24, 2002, Walker underwent an MRI[4]

of his lumbar spine, which was reviewed by Dr. Jim Cain ("Dr. Cain"), a radiologist.  (Tr. at 120).

Dr. Cain reported the following findings:

> L3-4:[5]  3-4 mm broad-based posterocentral and left posterolateral protrusion mildly
> indents the sac, mildly narrows the left foramen and displaces the emanating left L3
> nerve root sleeve/dorsal root ganglion.[6]  There is a small left posterolateral annular
> tear.[7]

(*Id.*).  This report was forwarded to Dr. Likover, on August 12, 2002, and he entered the following

in Plaintiff's chart:

> I personally reviewed the MRI films.  The MRI films look great for a man of this
> age.  I do not see any disk bulge and it appears to be over read by Dr. Cain.  Exam

---

[2] "Lumbar" refers to "the part of the body between the thorax and the pelvis."  MOSBY'S MEDICAL, NURSING, & ALLIED HEALTH DICTIONARY at 960 (5th ed. 1998).

[3] "Flexion" is "a movement allowed by certain joints of the skeleton that decreases the angle between two adjoining bones."  *Id.* at 641.

[4] "MRI" stands for "magnetic resonance imaging," a type of "medical imaging that uses radiofrequency radiation as its source of energy."  *Id.* at 977.

[5] The abbreviation "L3-4" refers to specific locations along the lumbar region.  *See id.* at 961-62.

[6] Referring to a "disk bulge" that is impacting surrounding nerve and bone structures.  *See id.* at 509, 652, 961-62, 1097.

[7] Referring to a small lesion or tear on the tissue supporting an intervertebral disk.  *See id.* at 95, 109, 1296.

> today reveals normal straight leg raising exam.  No physical findings of significance.
> My opinion is that Mr. Walker may continue working light duty.

(Tr. at 118).

During this period, Walker requested that the Texas Workers' Compensation Commission

("TWCC") allow him to change doctors.  He chose to be treated by Robert W. Moers, M.D [8] ("Dr.

Moers") because he disagreed with Dr. Likeover's treatment, and disliked the distance to his office.

(Tr. at 207).  Dr. Moers monitored Walker's condition from August 2002, through June 2004, and

filed periodic status reports with the TWCC throughout this period.  (Tr. at 146, 220-50, 272-356).

In the first of these reports, dated August 8, 2002, Dr. Moers informed the TWCC that Walker could

not work because of lower back pain and stiffness.  (Tr. at 150-58).  In each of his reports, Dr. Moers

found that testing "may indicate low back radiculopathy[9] or possibly a lumbar disk lesion," and that

pressure to Walker's lumbar region still generated moderate to severe pain.  (*Id.*).  On August 22,

2002, Dr. Moers made entries on a Functional Capacity Assessment form regarding Walker's

physical limitations.  (Tr. at 129).  He noted that Walker complained of "pressure, sharp, and aching

pain in the low back that radiates [to the back of his legs]," and which increased with any leg

movement.  (*Id.*).  He also reported that Walker was unable to complete the entire test because it

aggravated his pain, and he showed evidence of "mechanical and strength deficits."  (*Id.*).  Dr.

Moers found further that Walker demonstrated "low biomechanical tolerance for sustained activity."

(Tr. at 131).  He concluded that when Walker was able to return to work, he would be limited to

_____

[8] In his decision, the ALJ referred to Dr. Moers as a chiropractor.  (Tr. at 18).  However, there is no indication that Dr. Moers is, in fact, a chiropractor.  While the record is silent as to Dr. Moers's specialty, he uses the initials "M.D." with his name, the abbreviation for "Doctor of Medicine."  *See* MOSBY'S at 996.  Chiropractors typically use "D.C.," as the abbreviation for "Doctor of Chiropractic."  *See id.* at 319.

[9] "Radiculopathy" is "a disease involving a spinal nerve root."  *Id.*

8

sedentary or light work only, depending on the exertional requirements of the particular job.  (Tr. at 131-32).  In several of his reports, Dr. Moers also suggested that Walker consult with an orthopedic spine specialist.  (*See*, *e.g.*, Tr. at 273, 275, 277, 406).

Beginning on October 4, 2002, and in all subsequent status reports, Dr. Moers stated that Walker was precluded from a return to work because of continued back pain caused by a bulging disk.  (Tr. at 146).  In the last of these reports, dated June 9, 2004, Dr. Moers informed the TWCC that Walker could not return to work until, at the earliest, July 9, 2004, the date of his next appointment.  (Tr. at 272).

Walker also went to physical therapy on 19 occasions, between August 12 and September 27, 2002.  (Tr. at 119, 162-99).  These treatments and therapeutic procedures were intended to decrease his pain and increase his level of motion.  (*Id.*).  On September 30, 2002, Walker was examined by Dr. Hugo Orellana ("Dr. Orellana"), a neurologist, in response to his continued complaint of leg pain.  (Tr. at 143-44).  Dr. Orellana found that both of Walker's lower extremities were within normal limits, and that there was no evidence of radiculopathy.  (*Id.*).

On May 6, 2003, Dr. Moers completed a Physical Residual Functional Capacity Evaluation form on Walker ("RFC").  (Tr. at 210).  In that assessment, he diagnosed Walker as suffering from a disk bulge, and noted that his prognosis for recovery was "guarded."  (*Id.*).  He also reported that Walker had lower back pain, which radiated to his legs, and which severely restricted his movement, rendering him "unable to sleep, sit, or walk."  (*Id.*).  He found that Walker's pain and limitations were exacerbated by weather changes, and he noted a decrease in "flexion, extension, lateral flexion and rotation."  (Tr. at 210-11).  Dr. Moers suggested aqua-therapy and medication to treat Walker's pain.  (Tr. at 211).  Dr. Moers again recommended that Walker consult with an orthopedic surgeon,

concluding that he "needs surgery." (*Id.*).  In his assessment, Dr. Moers found that Walker was "constantly" in pain, and that he suffered from depression and anxiety.  (Tr. at 211-12).  He further found that Walker's ability to deal with work stress was severely limited.  (Tr. at 212).  Dr. Moers reported that Walker could "sit and stand/walk" for less than two hours in an eight-hour work day, and would have to walk frequently throughout the day.  (Tr. at 213).  He reported that Walker is in need of a cane, and that he cannot bend or twist.  (Tr. at 214).  Dr. Moers determined that Walker could lift or carry objects which weigh less than five pounds, frequently, but could only occasionally lift or carry objects that weigh up to 10 pounds.  (*Id.*).  He found that Walker could never lift or carry objects that weigh 20 pounds or more.  (*Id.*).  Dr. Moers noted that, at work, Walker would need "unscheduled" breaks every 2 to 3 hours during the work day, and would likely miss more than three days a month because of his impairments or treatment.  (Tr. at 213-14).  Finally, Dr. Moers found that Walker should avoid "extreme temperature and barometric pressure changes," presumably because of his earlier finding that his condition worsened with changes in the weather.  (Tr. at 210, 215).

On July 24, 2003, Dr. F.B. Higgins ("Dr. Higgins") also performed a physical RCF assessment, at the request of the state.  (Tr. at 251).  Dr. Higgins determined that Walker could lift or carry 20 pounds occasionally and 10 pounds frequently; that he could stand or walk for about six hours, in an eight-hour workday, and could sit for about 6 hours in an 8-hour workday.  (Tr. at 252). Dr. Higgins also found that Walker could frequently climb, balance, kneel, and crawl, but only occasionally stoop and crouch.  (Tr. at 253).  In addition, he found that Walker had no manipulative, visual, communicative, or environmental limitations.  (Tr. at 254-56).  In his report, Dr. Higgins commented that Walker's own reports of his symptoms were "not fully credible."  (Tr. at 256).

10

Between January and May 2004, Walker was also treated by Dr. Emilio Rene Cardona ("Dr. Cardona"), a psychiatrist and neurologist, at a pain management clinic. (Tr. at 259-70). In his initial assessment, dated January 29, 2004, Dr. Cardona noted that Walker had no history of depression before his work injury, but now has "periods of depression with passive suicidal thinking," including such thoughts as, "I wouldn't mind to die." (Tr. at 269). Dr. Cardona also made note of Walker's reports of insomnia and impotence. (*Id.*). He found that Walker had a flat affect, but that his focus and concentration, speech, and thought processes were normal, and that he appeared to have average intelligence. (*Id.*). Dr. Cardona diagnosed Walker as suffering from "pain disorder with depression," "major depression, single episode, moderate," and "chronic pain in the lumbar area," "moderate to severe due to his pain and disability." (Tr. at 270). Following his exam, Dr. Cardona assigned Walker a Global Assessment of Functioning ("GAF") score of 58.[10] (*Id.*). He then recommended a "multi-disciplinary pain management program of 6 weeks with pain treatment 8 hours a day," in addition to anti-depressant medications. (*Id.*). In a record dated April 28, 2004, Dr. Cardona reported that Walker had completed 20 pain management sessions, which had been helpful, although his pain remained. (Tr. at 264). He also reported that Walker's "depression has not been controlled." (*Id.*). Dr. Cardona observed that, "He is quite despondent with a degree of hopelessness and helplessness," and has had some passive suicidal thinking. (*Id.*). Dr. Cardona added that Walker's pain and his depression were both contributing to his continued disability. (Tr. at 264-65). In an "Exit Evaluation," dated May 26, 2004, Dr. Cardona reported that Walker was experiencing serious symptoms of depression. (Tr. at 259). He noted that Walker's insurance

---

[10] The GAF scale is used to rate "overall psychological functioning on a scale of 0-100," with 100 representing "superior functioning." AMERICAN PSYCHIATRIC INSTITUTE, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS ("DSM-IV") 32 (4th ed. 1994). A GAF score of 51-60 indicates "[m]oderate symptoms (*e.g.*, flat affect and circumstantial speech, occasional panic attacks), or moderate difficulty in social, occupational, or school functioning (*e.g.*, few friends, conflicts with peers or co-workers)." *Id.* at 34.

company did not approve payment for the prescribed anti-depressants, but that the clinic had been able to give him samples.  (*Id.*).  He also reported that, the previous week, Walker had suffered a "crisis" during the treatment, becoming suicidal and depressed.  (*Id.*).  He diagnosed Walker as suffering from a "pain disorder with significant psychological impairment," "major depression recurrence, severe," "chronic pain," and gave him a GAF of 55.  (*Id.*).  Dr. Cardona concluded his report as follows:

> We are strongly recommending for this patient treatment for depression.  He is going to need a very close psychiatric follow-up in my office.  It is imperative for the insurance company to approve the medications that are prescribed.  The prognosis is definitely good if he gets the treatment that we are recommending.
>
> I am requesting from the insurance company 15 sessions in the next three months. Due to the intensity of this depression, we will need to follow him up very closely. He may have to be hospitalized in the near future.

(Tr. at 260).

### *Educational Background, Work History, and Present Age*

At the time of the hearing, Walker was 48 years of age, with an 11th-grade education.  (Tr. at 391, 393).  Walker testified that his work history included jobs as a concrete laborer, a carpenter, and a dump truck driver.  (Tr. at 394-96).  He testified that he spent almost four years testing circuit boards for Compaq Computers.  (Tr. at 395-97).  He told the ALJ that, his last two jobs, at Omsco Industries and, most recently, at Northwest Pipe, required him to load, drive a crane, test pipes, act as a lab technician, and bundle materials.  (Tr. at 395-401).  Walker testified that he stopped working, in July 2002, because of the back injury he received while working for Northwest Pipe, which resulted in his claimed disability.  (Tr. at 18, 84).

### *Subjective Complaints*

In his application for benefits, Plaintiff stated that he is unable to work because the pain in his lower back and legs prevent him from standing for extended periods, as well as from bending, or lifting anything.  (Tr. at 84).  In the Daily Activity Questionnaire portion of his application, Walker stated that he is "in pain constantly all day and night" and that it interferes with his sleep. (Tr. at 101).  Walker reported that his pain impedes his ability to clean his house, rake the lawn, or even bathe himself.  (*Id.*).  Walker reported that he tries to walk for exercise, and practices lifting his legs.  (*Id.*).  Walker also stated that he takes the prescribed pain medication, but his pain persists. (*Id.*).

At the hearing, Walker testified that, when he injured his back, he went to the company clinic because he "could hardly walk."  (Tr. at 401).  The clinic then referred him to Dr. Likover, who released him to "light duty" work.  (Tr. at 401-02).  Walker testified that he stopped working, entirely, however, after one week on light duty, because:

> I couldn't walk.  I could just scoot.  I couldn't bend over.  I couldn't -- it was just lower part of my body, I just couldn't do anything.

(Tr. at 402).  Walker testified that he has not returned to work since, adding that his current doctor, Dr. Moers, still has not released him to do so.  (Tr. at 403-05).

Walker then testified that his pain is located primarily in his lower back, but that it also radiates down his legs, all the way to his feet and toes, with his middle toe causing him the most pain.  (Tr. at 404-05).  He told the ALJ that the pain interferes with his sleep, but that he no longer takes prescription pain medications or sleep-aids, because the TWCC will not approve his prescriptions for them.  (Tr. at 407).  He testified that he takes only Tylenol for his pain, but does take prescription medications for depression.  (*Id.*).  Walker also testified that sitting or lying on the

13

floor relieves his pain to some degree.  (Tr. at 407-08).  Walker testified that Dr. Moers wants him

to see a back specialist, but that the TWCC will not approve that referral.  (Tr. at 406, 408).

Walker told the ALJ that he can stand or sit for only 10 to 15 minutes before pain requires

him to change position.  (Tr. at 408).  He stated that he has to lie down on the floor for at least three

hours, off and on, every day, and that he can no longer mow the lawn or perform routine

maintenance on his truck, as he did before his injury.  (Tr. at 409-11).  Walker also stated that he

cannot drive very often because his toes and feet sometimes "get numb" while he is driving.  (Tr.

at 411). Walker stated that he does not have any friends, but he has a girlfriend, with whom he goes

to a movie once a month and to church twice a month.  (Tr. at 412).  He also testified that,

approximately 15 days a month, he has trouble getting out of bed at all.  (Tr. at 413).  Walker

testified that he has not tried to lift anything that weighs more than five to ten pounds since his

injury.  (Tr. at 446).

Walker also told the ALJ about his depression.  He testified that he sometimes has problems

with memory or concentration, and that his depression makes it difficult for him to get along with

others.  (Tr. at 415).  Finally, he testified that his depression and lack of lower body strength

interfere with his ability to engage in sexual relations, and that such limitations threaten his

relationship with his girlfriend.  (Tr. at 418).

### Expert Testimony

At the hearing, the ALJ also heard testimony from Dr. Wesley Scott, an orthopedic surgeon,

and a medical expert witness.  (Tr. at 419).  Dr. Scott's testimony was based entirely on his review

of the available medical records.  (*Id.*).  Dr. Scott testified that the medical evidence supports a

finding that Walker has a lumbar sacral strain.  (Tr. at 423).  He testified that Dr. Cain's report of

a bulging disk that impacts Walker's nerve roots, "has the capacity of producing pain."  (Tr. at 427).

14

He testified further that the annular tear that Dr. Cain observed "is reputably a source of pain." (*Id.*). He explained that certain movements, such as bending, lifting, or carrying heavy objects, could aggravate such pain. (Tr. at 427-28). However, Dr. Scott also testified that if the nerve roots were being significantly impacted, he would expect to see decreased neurological function, as well, but that Walker's records show no evidence of that. (Tr. at 423, 439). In sum, Dr. Scott testified that the records do not support a finding that Walker's impairments meet, or equal, any relevant SSA disability listing, although, from the evidence, he is capable of light work. (Tr. at 423-24).

Further, Dr. Scott testified that the pain Walker describes "really brings to mind more of a vascular deficiency," [11] rather than a lumbar strain. (Tr. at 428). He told the ALJ, "One of the things I noted that were [sic] not in the records were [sic] an evaluation of the vascular capacity, which I felt might have been of importance." (Tr. at 422). He explained that, in cases in which there "is radiation of pain into both lower extremities," but an absence of neurological involvement, a vascular evaluation "would add[] to the completion of the findings." (Tr. at 422-23). Dr. Scott also remarked that Walker's records show that his doctor had been trying to arrange an evaluation by a spinal specialist, which he "hope[d] would also include a circulatory [vascular] evaluation." (Tr. at 423). Finally, Dr. Scott referenced Dr. Cardona's report "in which the examiner indicates there was a particularly large amount of depression, . . . "that might be influencing [Walker's] activity." (Tr. at 423). He testified, however, that "this is certainly not [his] category" of expertise. (*Id.*). For that reason, he refused to answer questions from Plaintiff's attorney about whether Walker's medication was prescribed to treat his depression. (Tr. at 437-38).

---

[11] Referring to an inadequate blood flow through the blood vessels in the circulatory system. *See* MOSBY'S at 343, 1694.

15

In addition to Dr. Scott, the ALJ heard testimony from Kay Gilreath, a vocational expert witness.  (Tr. at 449).  Ms. Gilreath based her opinion on the records and the testimony at the hearing.  (Tr. at 449-50).  Ms. Gilreath classified Walker's former work, as a bundler or loader as heavy, unskilled labor.  (Tr. at 450).  She classified his work as a crane operator as medium and semi-skilled labor.  (*Id.*).  She testified that Walker's work as a laboratory technician was light to medium, semi-skilled labor.  (*Id.*).  She testified further that Walker's jobs as a circuit board tester and assembler were both light, semi-skilled jobs.  (*Id.*).  The ALJ then posed the following hypothetical questions to the vocational expert witness:

> Q      Assume we have a person of the same age, education, and vocational background as the claimant.  Further assume the following limitations.  This person can lift 20 pounds occasionally, 10 pounds frequently; can stand and/or walk four to six hours out of an eight-hour-day; no limit sitting; can only occasionally stoop, bend, crawl, kneel and climb; and cannot do any overhead reaching; also only occasionally bend.  That person cannot climb, however, ropes, ladders, or scaffolds.  This person requires only limited contact with the public, coworkers, and supervisors.  Could this person do any of the claimant's past relevant work?
>
> A      The job as the electronics assembler and tester would fall within that.
>
> Q      Is that the same job as circuit board tester?
>
> A      Yes.
>
> Q      Hypothetical number two, same as hypothetical number one, but add to that that this person would need to lie down approximately three hours out of each day.  Any jobs?
>
> A      No, that would rule out competitive employment.

(Tr. at 451).  On cross-examination, Walker's attorney continued this line of questioning, as detailed below:

> Q      Assume that the claimant could sit for 15 minutes and stand for 15 minutes alternately throughout the day.  How would that affect his ability to perform any of his prior work?

A       Well, I've found that with changing positions that often it interrupts the production level of a person, and vocationally to complete a task people normally need to be able to maintain a position for at least 30 minutes.

Q       So there would be no job -- he, he would not be able to do his prior relevant work.

A       Correct.

Q       And with that limitation would there be any jobs in the national economy that he could perform based upon his age, education, and prior . . . relevant work?

A       Well, again, just as a rule when someone's having to change positions that often, that tends to interrupt their tasks.

Q       . . . Assume that the claimant would be able to sit, stand, and walk less than two hours in a [sic] eight-hour workday, would there be any jobs in the national economy he could perform?

A       That would put him at below sedentary.

                                    *     *     *

Q       And assume that the claimant would be absent for work more than three days a month.  How would that affect his ability to perform competitive employment in the national economy?

A       Well, that would lead to problems with maintaining employment, that rate of absenteeism.

Q       And what would that mean maintaining employment?

A       Well, it would mean after a while an employer may fire a person.

Q       So you're saying there would be no jobs in the national economy he could perform based on that hypothetical?

A       Within those hypotheticals, yeah.

(Tr. at 451-53).

### *The ALJ's Decision*

Following the hearing, the ALJ made written findings on the evidence.  From his review of

the record, he determined that Walker has "[a] pain disorder, affective mood disorder, degenerative

17

joint disease of the lumbar spine and lumbar and groin strain," and that these conditions are "severe." (Tr. at 19, 27). He also found, however, that Walker does not have an impairment, or any combination of impairments, which meet, or equal in severity, the requirements of any applicable Listing. (Tr. at 19, 22). Ultimately, he concluded that Walker can resume his previous work as a circuit board tester, and so he is "not under a 'disability'" as defined by the Act. (Tr. at 23). With that conclusion, he denied Walker's applications for both DIB and SSI benefits. (*Id.*). That denial prompted Walker's request for judicial review.

Walker complains that the ALJ erred because he failed to make a finding of fact on the physical and mental demands of his previous employment. (Plaintiff's Motion at 6). Added to that claim is his complaint that the ALJ failed to compare his actual functional capacity with the demands of that previous employment. (*Id.* at 9). He argues further that the ALJ erred because he did not base his mental RFC assessment on the opinion of any medical source.[12] (*Id.*). In conclusion, Walker argues that the ALJ's decision is not supported by substantial evidence, and that he did not apply the proper legal standards. (*Id.* at 13).

Here, it is clear that the ALJ's decision was not supported by substantial evidence, and that this matter must be remanded so that the record can be developed further on the extent of Walker's physical and mental impairments. In his decision, the ALJ stated that he rejected Dr. Moers's assessment, dated May 6, 2003, because, "[a]pparently, Dr. Moers simply accepted the claimant's subjective complaints at face value, even though there is insufficient objective data in the claimant's chart to support this highly restrictive assessment." (Tr. at 18-19, 21). The law is clear, however, that an ALJ cannot reject a treating source's opinion without identifying specific, legitimate reasons

---

[12] In his response, Walker also raises a fourth complaint—that the ALJ's questions about his "sexual activity" were prejudicial, which deprived him of a fair hearing. (Plaintiff's Response at 7-8; Tr. at 417-18).

to do so. *See Schwartz v. Barnhart*, 70 Fed. Appx. 512 (10th Cir. 2003). In fact, the Fifth Circuit "has repeatedly held that ordinarily the opinions, diagnoses and medical evidence of a treating physician who is familiar with the claimant's injuries, treatment, and responses should be accorded considerable weight in determining disability." *Loza*, 219 F.3d at 395; *see Myers*, 238 F.3d at 621; *Greenspan*, 38 F.3d at 237. However, it is also true that "[t]he law is clear that, although the opinion of an examining physician is generally entitled to more weight than the opinion of a non-examining physician, the ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion." *Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1987) (quoting *Oldham v. Schweiker*, 660 F.2d 1078, 1084 (5th Cir. 1981)). And it is equally well-settled that an ALJ must evaluate every medical opinion that is received on a claimant's behalf, and he cannot reject the opinion of a treating physician without "good cause" to do so. *See* 20 C.F.R. § 404.1527(d); *Myers*, 238 F.3d at 621; *Loza*, 219 F.3d at 395; *Newton*, 209 F.3d at 455-56; *Greenspan*, 38 F.3d at 237; *Scott*, 770 F.2d at 485. "Good cause" may exist when the treating physician's statements are "brief and conclusory, not supported by medically acceptable clinical laboratory diagnostic techniques, or otherwise unsupported by the evidence." *Myers*, 238 F.3d at 62l; *see Greenspan*, 38 F.3d at 237; *see also Newton*, 209 F.3d at 456. But Fifth Circuit precedent is clear that:

> A finding that a treating source medical opinion is not well supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. *Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927.* In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted even if it does not meet the test for controlling weight.

*Id.* (quoting SSR 96-2p).  For that reason, a claimant is entitled to a remand if the ALJ rejects, or gives little weight to, a treating doctor's opinion without considering each of the factors set out in the Social Security regulations.[13]  *See Myers*, 238 F.3d at 621; *Newton*, 209 F.3d at 456.

Further, even if the ALJ does show "that the treating physician's records are inconclusive or otherwise inadequate to receive controlling weight," but the record lacks sufficient medical evidence to contradict the disputed assessment, then "the ALJ must seek clarification or additional evidence from the treating physician in accordance with 20 C.F.R. § 404.1512(e)."  *Id.* at 453.  That regulation provides that a treating physician's records are considered "inconclusive" if they "contain[] a conflict or ambiguity that must be resolved"; if they do "not contain all the necessary information"; or if they do "not appear to be based on medically acceptable clinical and laboratory techniques."  *Id.* at 457 (quoting 20 C.F.R. § 404.1512(e)(1)).  "Reversal, however, is appropriate only if the applicant shows prejudice from the ALJ's failure to request additional information."  *Id.* at 458.  To make such a showing, the claimant must demonstrate "that additional evidence would have been produced if the ALJ had fully developed the record, and that the additional evidence might have led to a different decision"—that the claimant "'could and would' have adduced evidence that might have altered the result."  *Carey v. Apfel*, 230 F.3d 131, 142 (5th Cir. 2000) (quoting *Kane v. Heckler*, 731 F.2d 1216, 1220 (5th Cir. 1984)); *Newton*, 209 F.3d at 458 (quoting

---

[13] Those factors are as follows:
>    (1) the physician's length of treatment of the claimant;
>    (2) the physician's frequency of examination;
>    (3) the nature and extent of the treatment relationship;
>    (4) the support of the physician's opinion afforded by the medical evidence of record;
>    (5) the consistency of opinion with the record as a whole; and
>    (6) the specialization of the treating physician.
> *Newton*, 209 F.3d at 456; *see Myers*, 238 F.3d at 621; 20 C.F.R. § 404.1527(d)(2)-(6).

*Ripley*, 67 F. 3d at 557 n.22); *Brock v. Chater*, 84 F.3d 726, 728 (5th Cir. 1996) (quoting *Kane*, 731 F.2d at 1220).

Here, the ALJ was explicit that he "reject[ed]" Dr. Moers's RFC assessment because he perceived it to be based on Walker's subjective complaints alone, and not supported by objective medical evidence or diagnostic testing. (Tr. at 19, 21). He then cited Dr. Likover's findings instead, which concluded that Walker was not severely impaired. (Tr. at 20-21). Dr. Likover, however, treated Walker for less than two months, whereas Dr. Moers has been his long-term treating physician. Further, Dr. Moers's records do contain results from numerous examinations, and diagnostic tests, all of which appear to support his overall conclusions. (*See* 129, 171-94). Many of these records are not addressed or referenced, in any way, in the ALJ's decision. Moreover, even Dr. Scott, the testifying expert witness, observed that Dr. Cain's findings support Walker's allegations of pain. (Tr. at 120, 427-28). Further, the ALJ noted his reliance on Dr. Scott's testimony that there was no objective evidence to support an impairment that meets or equals the applicable Listings. (Tr. at 19-22). However, Dr. Scott was explicit in his testimony that, while his opinion was based on the evidence available, he believed that a vascular evaluation would complete the record and allow him to determine more accurately the extent of Walker's impairment. (Tr. at 422-23, 428). Under these circumstances, the court is persuaded that the ALJ did not provide sufficient reasoning to reject Dr. Moers's opinions. Further, Dr. Scott's testimony suggests that a more complete record, including the results of a vascular evaluation, is necessary before an accurate assessment of Walker's physical limitations can be made. In determining whether a disability exists, an ALJ "owe[s] a duty to a claimant to develop the record fully and fairly to ensure that his decision is an informed decision based on sufficient facts." *Brock*, 84 F.3d at 728 (citing *Kane*, 731 F.2d at 1219). If he fails to do so, his decision is not supported by substantial evidence, and is subject to

reversal if the error results in prejudice to the claimant. *Newton*, 209 F.3d at 456-57; *Ripley*, 67 F.3d at 557.   Here, the ALJ had a duty to develop the record further, including seeking additional evidence from a vascular evaluation,[14] according to the sole medical witness, before rendering a decision.  *See Newton*, 209 F.3d at 453, 456-57.  For that reason, further evidence is necessary to permit an accurate assessment of Walker's actual physical limitations.

Likewise, the record is not sufficient to support a finding that Walker's mental condition does not constitute a disability.  In his decision, the ALJ addressed Dr. Cardona's findings on Walker's mental state.  (Tr. at 19).  He did not, however, reject these findings, but determined only that, while Walker has an "affective mood disorder," which is "severe," it is not equal to any applicable Listing.  (*Id.*).  He then observed that Dr. Cardona had given Walker a GAF score of 58 in January 2004, and a GAF score of 55 in May 2004, and that both scores suggest only a moderate impairment.  (Tr. at 20).  At no point in his decision, however, did the ALJ reject, or even address, Dr. Cardona's findings that Walker had suicidal thoughts, a "flat affect," and other depressive symptoms that contributed to his disability.  (Tr. at 264-65, 269).  Further, he failed to address Dr. Cardona's May 2004 findings, that Walker had recently suffered a psychological "crisis," that he was in need of very close psychiatric supervision, and that he "may have to be hospitalized in the near future."  (Tr. at 260).  In addition, the ALJ noted, but did not rely on Dr. Cardona's diagnosis of "pain disorder with significant psychological impairment and major depression recurrence, severe." (Tr. at 19).  Further, Dr. Scott also raised, without prompting, the issue of Walker's mental health.  That suggests that he too believed that Walker's mental state is a significant component in evaluating his level of impairment.  (Tr. at 423).   It is also worth noting that, on at least two

---

[14] Under the regulations, the SSA can order tests from a medical source.  *See* 20 C.F.R. §§ 404.1519, 416.919.

occasions during the hearing, Plaintiff's attorney called the issue of Walker's mental state to the ALJ's attention.  (Tr. at 445, 454).   It must be noted that the record, as a whole, contains no evidence that contradicts Dr. Cardona's seemingly significant findings.  Finally, no mental health expert witness testified at the hearing, and no mental RFC was ordered.  While these latter two are not required in all cases, there is uncontroverted evidence here that Plaintiff suffers from serious depressive symptoms.   At the least, a mental RFC assessment is appropriate.  *See* 20 C.F.R. §§ 404.1512(d)-(f), 404.1519a-p, 416.919a-p.  Consequently, the ALJ also had a duty to develop the record further on Walker's mental condition, including a mental RFC assessment, before rendering his decision.  *See Newton*, 209 F.3d at 453, 456-57.

From the record, as whole, it is clear that Walker is entitled to a  remand so that the ALJ may properly develop the administrative record on both his physical and his mental impairments.  As the Fifth Circuit has explained, "where the rights of individuals are affected, an agency must follow its own procedures, even where the internal procedures are more rigorous than otherwise would be required." *Newton*, 209 F.3d at 459 (quoting *Hall v. Schweiker*, 660 F.2d 116, 119 (5th Cir. 1981)). "If prejudice results from the violation, the result cannot stand." *Id.*   Clearly, Walker's rights were affected because the ALJ abrogated his duty to develop the record fully as to his physical and mental impairments. *See* 20 C.F.R. § 404.1545(a) (1986).  For these reasons, this matter is remanded, under sentence four of 42 U.S.C. 409(g), so that the record can be developed fully, which will allow the ALJ to render a decision that is supported by substantial evidence.

**Conclusion**

Based on the foregoing, it is **ORDERED** that Plaintiff Reginald C. Walker's Motion for Summary Judgment is **GRANTED**, and that Commissioner Jo Anne B. Barnhart's Motion for

Summary Judgment is **DENIED**.  It is further **ORDERED** that Plaintiff's claim for Disability Insurance Benefits and Supplemental Security Income benefits is **REMANDED**, so that the record can be further developed on the severity of Plaintiff's physical and mental impairments, consistent with this opinion.  Additional evidence must include obtaining a vascular evaluation of Walker, as well as a mental RFC assessment, consistent with this opinion.

This is a **FINAL JUDGMENT**.

The Clerk of the Court shall enter this order and provide a true copy to all counsel of record

**SIGNED** at  Houston, Texas, this 26th day of September, 2006.

**MARY MILLOY**
**UNITED STATES MAGISTRATE JUDGE**